**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                                  :
                                                  :        Civil Action No. 05-2681 (JAG)
IN RE ABLE LABORATORIES SECURITIES   :
LITIGATION                                      :                **OPINION**
                                                  :
_____  :

**APPEARANCES**:

Francis J. Vernoia, Esq.
Genova, Burns & Vernoia
331 Newman Springs Road
Red Bank, NJ 07701
For Plaintiff David Kriegel

Stuart M. Grant, Esq.
Grant & Eisenhofer, PA
1201 N. Market Street
21st Floor
Wilmington, DE 19081
For Movant Denver Employees Retirement Plan

Daniel S. Sommers, Esq.
Cohen, Milstein, Hausfeld & Toll, PLLC
Suite 500 West
1100 New York Avenue, NW
Washington, DC 20005
For Movant the Webster Family

Warren A. Usatine, Esq.
Cole, Schotz, Meisel, Forman & Leonard, PA
25 Main Street
Hackensack, NJ 07601
For Movant Richard Upham

J. Erik Sandstedt, Esq.
Bernstein, Litowitz, Berger &
Grossmann, LLP
1285 Avenue of the Americas
New York, NY 10019
For Movant Richard Upham

Marvin L. Frank, Esq.
Kimberly D. Reilly, Esq.
Murray, Frank & Sailor
275 Madison Avenue
New York, NY 10016
For Movant Deka International (Ireland)
Limited

Paul Kizel, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068
For Defendant Able Laboratories, Inc.

Daniel Winters, Esq.
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
For Defendant Able Laboratories, Inc.

1

**GREENAWAY, JR., U.S.D.J.**

      This matter comes before this Court on the motions of the Denver Employees Retirement Plan ("DERP"), Deka International (Ireland) Limited ("Deka"), Richard Upham ("Upham"), Floyd Webster, Kent Webster, Keith Webster and Helen Darrah (the "Webster Family"), the Communications Workers of America Plan for Employees' Pensions and Death Benefits ("CWA") with Daniel Levy, Genesee County Employees Retirement System with Julian M. Warren ("Genesee and Warren"), Edward Howlette, and Charles M. Gillis for appointment as lead plaintiff and appointment of their respective attorney as lead counsel. Following the filing of the individual motions seeking appointment as lead plaintiff, Deka and DERP proposed combining to form the Institutional Investor Group ("IIG"). For the reasons set forth below, this Court will appoint the IIG as lead plaintiff, and Grant & Eisenhofer P.A. and Murray, Frank and Sailer LLP as co-lead counsel.

**Background**

      Between May 23, 2005 and June 16, 2005, nine cases were filed in this Court alleging security fraud violations by Able Laboratories ("Able Labs" or "Able") and various officers of Able.[1] Specifically, the complaints alleged that (1) Able Labs and the individual defendants made misrepresentations of material facts regarding Able's operations and (2) the individuals were control persons for purposes of § 20(a) of the Exchange Act. Allegedly, Able Labs, a manufacturer and developer of generic drugs, issued false and misleading public statements between 2002 and early 2005. These public statements addressed favorable financial results, as

---

    [1] By order dated January 25, 2006, these nine cases were consolidated.

well as positive progress on obtaining Federal Drug Administration ("FDA") approvals for

multiple abbreviated new drug applications ("ANDAs").  In May 2005, Able announced several

product recalls, accompanied by the commencement of an internal compliance review directed at

correcting problems with improper laboratory practices and noncompliance with various FDA

requirements.  As a result of the recalls and disclosure of the compliance review, the price of

Able's stock decreased dramatically.

As is required by the Private Securities Litigation Reform Act ("PSLRA"), on May 23,

2005, a notice was published in the PR Newswire, "a widely circulated national business-

oriented publication or wire service," alerting members of the purported plaintiff class of the

pendency of the action.  15 U.S.C. § 78u-4(a)(3)(A)(i).  Pursuant to 15 U.S.C.

§ 78u-4(a)(3)(A)(i)(II), within sixty days of the publication of this notice, eight motions were

filed by entities seeking appointment as lead plaintiff.  Attached to each of these motions was a

sworn certification setting forth the information required by 15 U.S.C. § 78u-4(a)(2)(A).  That is,

the certifications

(i) state[d] that the plaintiff has reviewed the complaint and authorized its filing;

(ii) state[d] that the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this chapter;

(iii) state[d] that the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

(iv) set[] forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint;

(v) identifie[d] any other action under this chapter, filed during the 3-year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class; and

3

(vi) state[d] that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4).

The transactions set forth in each of the certifications filed within the sixty-day limit demonstrated alleged losses in the following amounts:

| | |
|---|---|
| DERP | $841,282 (94,700 shares ) |
| Deka | $882,357.22 (174,374 shares) |
| Upham | $1,589,163.09 (92,027 shares) |
| Webster Family | $542,900 (24,800 shares) |
| CWA and Daniel Levy | $243,216.22 |
| Genesee and Warren | $399,742.21 |
| Edward Howlette | $94,188 |
| Charles M. Gillis | $348,847.20 |

Before proceeding, this Court emphasizes that, for purposes of consideration of the motions for appointment as lead plaintiff, Upham's alleged losses are $1,589,163.09.  Although Upham's counsel offered a revised certification alleging a loss of $2,130,804.66[2] during oral argument on January 23, 2006, that certification was submitted well beyond the sixty-day time limit set forth in 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).  The sixty-day limit is mandatory.  That is, "[t]he plain language of the statute precludes consideration of a financial loss asserted for the first time in a complaint, or any other pleading, for that matter, filed *after* the sixty (60) day window has closed."  In re Telxon Corp. Sec. Litig., 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999)

---

[2]  This Court notes that the revised certification presented during oral argument reflected, in addition to the higher total alleged loss, different total shares traded, and different trade dates.

(emphasis in original). During oral argument on January 23, 2006, Upham's counsel acknowledged that the revised certification was being offered for informational purposes only, and that the loss amount to consider for purposes of the motion is the number from the original certification. (Tr.[3] 48:3-48:16.)[4]

On August 29, 2005, in a response to the motions for appointment as lead plaintiff, Deka and DERP requested that they be allowed to combine to form the IIG, with total alleged losses of $1,723,639. In the same response, the IIG opposed the appointment of Upham as lead plaintiff. The IIG based their opposition to Upham's appointment on the fact that Upham does not have the largest financial interest and that he has not met his burden of establishing a prima facie showing of adequacy to serve as lead plaintiff.

Upham, in turn, opposes the selection of the IIG as lead plaintiff, arguing that Deka and DERP should not be allowed to combine after the sixty-day period set forth in 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). If Deka and DERP are allowed to combine to form the IIG, then Upham

---

[3] "Tr." refers to the transcript of the oral argument held before this Court on January 23, 2006.

[4] Parenthetically, on August 29, 2005, the Webster Family withdrew its motion to be appointed as lead plaintiff. Although in its withdrawal notice, the Webster Family stated that "the Webster Family hereby withdraws its pending Motion, but remains willing to serve the proposed class in a representative capacity along side [sic] any of the other movants for Lead Plaintiff in this action," (Notice of Withdrawal of the Webster Family's Mot. for the Consolidation of all Related Actions, to be Appointed Lead Pls. and for the Approval of their Selection of Lead Counsel 2), a concept that counsel reiterated during oral argument (Tr. 35:15-36:13), this Court accepts the withdrawal at face value, and deems the Webster Family's motion withdrawn. By contrast, rather than explicitly withdrawing their motion, lead plaintiff movants Genesee and Warren filed a response to the motions for appointment as lead plaintiff in which they acknowledged that other potential lead plaintiffs had greater alleged losses, but that they would still be willing to serve as lead plaintiff. (Resp. of Genesee County Employees' Retirement System and Julian M. Warren to Competing Mots. for Appointment as Lead Pl. and Approval of Selection of Lead Counsel 5.) Given the factors to be considered in a lead plaintiff determination, Genesee and Warren shall not be part of the final calculus.

opposes their appointment due to Deka's alleged lack of standing and an alleged investigation into Deka's parent company by German authorities for financial irregularities.[5]

**Legal Standard**

*Rebuttable presumption – "most adequate plaintiff"*

The PSLRA establishes the criteria to be used in evaluating the qualifications of individuals and groups seeking to be appointed as lead plaintiff. Specifically, 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) creates a rebuttable presumption in favor of appointing the "most adequate plaintiff" as lead plaintiff. The "most adequate plaintiff" is defined as a "person or group of persons that – (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i); (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." Id. However, this presumption can be rebutted if "the presumptively most adequate plaintiff – (aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

*Largest financial interest*

The Third Circuit has concluded that "largest financial interest" means the largest loss. In re Cendant Corp. Litig., 264 F.3d 201, 223 (3d Cir. 2001). However, observing that "[t]he Reform Act provides no formula for courts to follow in making this assessment," the Third Circuit recommends that, in cases that do not present a clear choice as to the largest financial

---

[5] Upham also opines that, if Deka and DERP are allowed to combine, then he should be allowed to combine with the Webster Family. However, since the Webster Family withdrew their motion for appointment as lead plaintiff, they are no longer a potential lead plaintiff movant.

interest, courts also consider "(1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs." Id. at 262.

*Rule 23*

In appointing a lead plaintiff, "[t]he initial inquiry (i.e., the determination of whether the movant with the largest interest in the case 'otherwise satisfies' Rule 23) should be confined to determining whether the movant has made a *prima facie* showing of typicality and adequacy." Id. at 263. "[T]he court's initial inquiry as to whether the movant with the largest losses satisfies the typicality and adequacy requirements need not be extensive." Id. at 264. The analysis should be based on "traditional Rule 23 principles." Id. at 264-65. That is, in considering whether the plaintiff has "preliminarily satisfied the typicality requirement, [courts] should consider whether the circumstances of the movant with the largest losses 'are markedly different or the legal theory upon which the claims [of that movant] are based differ[] from that upon which the claims of other class members will perforce be based.'" Id. at 265 (quoting Hassine v. Jeffes, 846 F.2d 169, 177 (3d Cir. 1988)).

As to the adequacy requirement, "courts should consider whether [the plaintiff] 'has the ability and incentive to represent the claims of the class vigorously, [whether it] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class.'" Id. (quoting Hassine, 846 F.2d at 179). In making the initial adequacy assessment, the Third Circuit has emphasized the importance of ensuring that a lead plaintiff has "demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel." Id.

*Individual vs. group as lead plaintiff*

7

The Third Circuit has explicitly rejected the conclusion reached by other courts that the PSLRA "invariably precludes a group of 'unrelated individuals' from serving as a lead plaintiff." Id. at 266.  However, in assessing whether a group satisfies the adequacy prong of the Rule 23 analysis, the Third Circuit incorporates an extra step in the process.  That is, a court must determine whether  "the way in which a group seeking to become lead plaintiff was formed or the manner in which it is constituted would preclude it from fulfilling the tasks assigned to a lead plaintiff."  Id.  Essentially, the Third Circuit disapproves of groups that are created by counsel in an effort to satisfy the largest financial loss requirement.  If the court concludes that the group was created by counsel rather than class members, then "the court should disqualify that movant on the grounds that it will not fairly and adequately represent the interests of the class."  Id.  The Third Circuit has also instructed district courts to consider the size of the group, and, while not establishing a hard and fast rule regarding what constitutes a group that is too large to represent the class effectively and adequately, the Third Circuit has endorsed the Securities and Exchange Commission's recommendation that groups should not exceed five members.  Id. at 267.

*Rebutting the presumption*

As stated earlier, once a presumptive lead plaintiff has been identified, the presumption can be rebutted if "the presumptively most adequate plaintiff – (aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  The Third Circuit has emphasized that "only class members may seek to rebut the presumption, and the court should not permit or consider any arguments by defendants or non-class members." Cendant, 264 F.3d at 268.  Additionally, "once the presumption is triggered, the question *is not* whether another movant might do a better job of protecting the interests of the class than the

presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a 'fair [] and adequate []' job." Id. (emphasis in original).

**Analysis**

*Selection of lead plaintiff*

Before this Court can consider the question of who the most adequate plaintiff is, it must first determine who the potential lead plaintiffs are. That is, this Court first must address Upham's objection to the combination of Deka and DERP to form the IIG.[6] Simply stated, the question presented is whether two movants, each of whom filed a motion and certification within the sixty-day deadline established by 15 U.S.C. § 78u-4(a)(3)(A)(i)(II),[7] can, based on their own initiative and concerns about the adequacy of the otherwise presumptive lead plaintiff, unite after the expiration of the sixty-day period to form a group. This Court has been unable to find a case that directly addresses this question.

The cases cited by Upham are inapposite. In addition, all of the cases Upham cites are district court cases, none in this circuit. As such, even if the cases were on point, they would have no precedential value.

The courts in Upham's cases rejected the appointment of groups for various reasons, none of which are applicable here. One court rejected a group because it was "simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as 'lead plaintiff.'" In re Razorfish, Inc. Sec.Litig., 143 F. Supp.

---

[6] There is no doubt that the Third Circuit approves of groups serving as lead plaintiff, so long as the group was not formed by counsel in order to satisfy the largest financial loss requirement. Cendant, 264 F.3d at 266.

[7] This Court notes that there is no dispute as to the timeliness of Deka's and DERP's individual motions to serve as lead plaintiff.

2d 304, 308 (S.D.N.Y. 2001).[8]  The Third Circuit has similarly expressed concern over groups that were created by counsel rather than class members, and directed that, in those situations, "the court should disqualify that movant on the grounds that it will not fairly and adequately represent the interests of the class."  Cendant, 264 F.3d at 266.

There is no evidence before this Court that the IIG was formed by counsel rather than the parties.  In fact, evidence to the contrary exists.  According to the declarations submitted by Victoria Halliday, General Counsel for DERP, and Grainne Walsh, General Manager/Director of Deka, they, not their counsel, sought each other out after learning that Upham would be the presumptive lead plaintiff.  (Decl. of Victoria Halliday ¶¶ 3, 4; Decl. of Grainne Walsh ¶¶ 3, 4.[9])  Their initial contact with each other was prompted by their concern over the lack of information available on Upham's background and experience, and the likelihood that Upham would not be able to fulfill the responsibilities of serving as lead plaintiff.  (Decl. of Victoria Halliday ¶ 3;

---

[8] Similarly, the court in In re Vaxgen Sec. Litig., No. C 03-1129 JSW (N.D. Cal. Apr. 14, 2004), declined to appoint a group as the lead plaintiff due to the constant realigning of group membership and the appearance that the groups were being manipulated by counsel.  In fact, the court perceived several potential problems, "not the least of which are the shifting memberships and alliances resulting in the abandonment of the old group members, the failure to provide any explanation regarding how the conflict between the old and the new groups has been resolved, and finally, the appearance that the Group was manufactured in an effort to have its members designated as lead plaintiffs, and more importantly its counsel designated as class counsel."  Id. at 7.  The case before this Court lacks any of these machinations designed to evade the statute's purpose.

[9] Upham's counsel infers nefarious intent from the similarity of language in paragraphs 3 and 4 in the declarations of Ms. Halliday and Ms. Walsh, and concludes that these similarities indicate the union of Deka and DERP must therefore be "lawyer driven."  (Reply Mem. 9 n.7.)  Each of the affiants is an attorney and is cognizant of the appropriate language necessary in this instance.  There is no basis to assume any collusion.  Ms. Walsh even emphasizes this point by stating that she and Ms. Halliday "intend to actively monitor this litigation and to jointly participate in all significant decisions, rather than simply relying on counsel."  (Decl. of Grainne Walsh ¶ 4.)

Decl. of Grainne Walsh ¶ 3.)  Additionally, during oral argument, counsel for DERP repeatedly stated that it was the institutional investors themselves who decided to work together.  (Tr. 40:4-40:6; 41:12-41:14.)  He also noted that his client was "more worried now about [Upham] than [she] was when we decided to move forward." (Tr. 38:12-38:13.)  Further, Deka and DERP are both sophisticated institutional investors, with general counsel and professional managers who are experienced in overseeing litigation.  (E.g., Tr. 13:6-13:7; 38:13-38:15; 42:7-42:12; Decl. of Victoria Halliday ¶¶ 1, 2; Decl. of Grainne Walsh ¶¶ 1, 2, 7.)  Based on the evidence before this Court, it is apparent that the IIG was formed by the actions of the clients, and not counsel.

Another court rejected appointment of a group due to the unwieldy size of the group.[10] The Third Circuit has also commented on group size, and, while not adopting a hard and fast rule, has endorsed the Securities and Exchange Commission's recommendation that groups should not exceed five members.  Cendant, 264 F.3d at 267.  With only two members, the group here falls well within that recommended size range.

Other courts have rejected groups due to untimely filing of either the certification of alleged losses or the complaint.  Specifically, in In re Telxon Corp. Sec. Litig., 67 F. Supp. 2d 803 (N.D. Ohio 1999) the court rejected an individual pension fund movant due to the fact that

---

[10]  In In re Telxon Corp. Sec. Litig., 67 F. Supp. 2d 803 (N.D. Ohio 1999), three entities sought appointment as lead plaintiff – one group of eighteen unrelated investors, one group of family members and their investment advisor, and a pension fund.  Id. at 805.  The court rejected appointment of the investor group due to its unwieldy size, the group's inability or unwillingness to agree on a single counsel to represent it, the unlikelihood that that large a group would be able to supervise and control the litigation, the difficulty associated with maintaining communications among the large number of group members, and the fact that the group would be unable to "speak and act with a uniform purpose" since it lacked cohesiveness.  Id. at 810, 815-16.  Here, instead of a group of eighteen unrelated parties, the proposed group consists of two institutional investors, both of whom have expressed a willingness to work together. (Decl. of Victoria Halliday ¶ 4; Decl. of Grainne Walsh ¶¶ 4-6.)

the pension fund filed its initial pleading seeking to be appointed as lead plaintiff thirty days after the deadline established by the PSLRA.  Id.  Unlike that movant, both Deka and DERP filed certifications alleging their respective financial losses within the sixty-day time frame.  Similarly, the court in Switzenbaum v. Orbital Sciences Corp., 187 F.R.D. 246 (E.D. Va. 1999), rejected inclusion of a member who "never filed a complaint himself or moved for appointment within the time that the PSLRA requires of those who hope to become the Lead Plaintiff."  Id. at 249. Clearly, both Deka and DERP have filed motions to be appointed as lead plaintiff within the sixty-day period, and thus satisfied the requirements of the PSLRA.[11]

Not only has Upham failed to demonstrate that there would be any harm in allowing Deka and DERP to combine, this Court perceives various benefits to their union.  For example, Victoria Halliday, General Counsel for DERP, has eight years of experience overseeing outside counsel in complex litigation.  (Decl. of Victoria Halliday ¶ 1.)  In addition, "DERP has dedicated legal and investment staffs, and the expertise and resources necessary to effectively oversee complex securities class actions."  (Id. at ¶ 2.)  DERP has experience serving as lead plaintiff, and participated in obtaining a $300 million settlement in the In re DaimlerChrsyler AG Securites Litigation.  (Id.)  DERP has also negotiated a favorable fee agreement, with a sliding scale of attorneys' fees ranging from 9% to 23%, which Deka and their counsel have agreed to

---

[11]  Upham cites other cases that are either completely inapposite or provide no reasoning that would assist this Court in assessing the case before it.  For example, in Weinberg v. Atlas Air Worldwide Holdings, Inc., 216 F.R.D. 248 (S.D.N.Y. 2003), the court declined to appoint a group consisting of two movants who combined after the motions for appointment of lead plaintiff were filed based on the theory that they each were a "niche plaintiff," representing distinct subgroups of the as yet uncertified class.  Id. at 253.  Neither Deka nor DERP argue that they are "niche plaintiffs," or that their appointment is necessary to ensure representation of a particular subgroup of plaintiffs.  The remaining cases are so far afield that this Court need not discuss them.

abide by.  (Id. at 5.)

Grainne Walsh, General Manager/Director of Deka, has been General Manager since 1999.  (Decl. of Grainne Walsh ¶ 1.)  She asserts that "Deka has substantial assets that are routinely utilized to oversee investments and transactions that occur throughout the world."  (Id. at ¶ 7.)  Further, Ms. Walsh believes that working together with DERP would be beneficial for the class by "enhanc[ing] the ability of the Group to effectively manage the litigation and, ultimately, achieve a better result for the class."  (Id. at ¶ 5.)  During oral argument, counsel for Deka and DERP commented on their clients' qualifications.  (Tr. 13:6-13:8; 38:8-38:17; 40:25-41:2; 42:8-43:2; 56:3-56:6.)

Given the factors other courts have considered in deciding whether or not to allow a group to serve as lead plaintiff, this Court concludes that it is appropriate for Deka and DERP to form a group and serve together as lead plaintiff.  First, they have satisfied the first requirement of 15 U.S.C. § 78u-4(a)(3)(A)(i)(II) by filing timely individual certifications in response to the published notice.  Second, based upon the certifications of Ms. Halliday and Ms. Walsh, as well as the statements made by counsel during oral argument, this Court is satisfied that the clients, and not counsel, were the motivating force behind the formation of an alliance between Deka and DERP.  Additionally, this Court believes that Deka and DERP have the experience and administrative support necessary for managing and overseeing a complex securities class action.

Having concluded that it is appropriate for Deka and DERP to combine to form the IIG, this Court also concludes that the IIG is presumptively the most adequate plaintiff in light of their alleged losses of $1,723,639.  Upham's alleged losses total $1,589,163.09.

Upham attempts to rebut this presumption by claiming Deka lacks standing to serve as a lead plaintiff and that there is an ongoing investigation into Deka's parent company by German

authorities for financial irregularities.  As discussed in detail below, this Court finds neither of these arguments persuasive.

### *Lack of standing – Deka*

As to Deka lacking standing to sue, Upham bases his argument on the fact that Deka's parent company "is the leading asset manager and central investment fund provider for the German Savings Banks Financial Group."  (Reply Mem. 9-10.)  Upham continues to theorize that Deka, therefore, "is in the business of managing its clients' money and purchasing securities, not in its own right, but for the accounts of its clients."  (Id. at 10.)  To have standing under § 10(b), a plaintiff need only show it bought and sold shares of stock.  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731-32 (1975).  See also 14A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 59:340 ("Standing to sue under the antifraud provisions of the federal securities laws is limited to purchasers and sellers of securities.").  In the certification attached to its motion to be appointed as lead plaintiff, Deka states that it bought and sold shares of Able, as required by 15 U.S.C. § 78u-4(a)(2)(A)(iv).

Upham cites In re Peregrine Sys., Inc. Securities Litig., No. 02 cv 870-J(RBB), 2002 WL 32769239 (S.D. Cal. Oct. 11, 2002) for the proposition that an investment advisor lacks standing to sue.  That decision relied upon the reasoning in Smith v. Suprema Specialties, Inc., 206 F. Supp. 2d 627 (D.N.J. 2002) in concluding that an investment advisor who only purchased shares on behalf of its clients and did not present any evidence that the clients consented to the lawsuit cannot serve as lead plaintiff.  In re Peregrine Sys., 2002 WL 32769239, at *13-14.

Judge Walls, in Suprema, concluded that an investment advisor that represented twenty-two individual institutional investors could not serve as lead plaintiff because it could not aggregate the losses of the twenty-two entities it represents in order to have the largest financial

14

loss.  Further, the investment advisor could not bring the action on behalf of its clients because there was no evidence that it had permission to act on behalf of the clients.  Third, none of the individual clients who were the actual owners of the stock had submitted a certification regarding the purchase or sale of the securities in question.  Finally, a group of twenty-two investors was too large to work effectively.  <u>Suprema</u>, 206 F. Supp. 2d at 634.

By contrast, Judge Walls, in <u>Roth v. Knight Trading Group, Inc,</u>, 228 F. Supp. 2d 524 (D.N.J. 2002), allowed an investment advisor to serve as lead plaintiff because the advisor had "demonstrated to the Court's satisfaction that it has complete investment authority over its trades, and is agent and attorney-in-fact with full power and authority to act in connection with its investments."  <u>Id.</u> at 529.

In her certification, Ms. Walsh described Deka as a fund administration company that "offers and manages numerous investment funds."  (Decl. of Grainne Walsh ¶ 2.)  During oral argument, counsel for Deka asserted that Deka is "just not an excess asset manager, they have attorneys with full discretionary authority over the 3.5 billion Euros."  (Tr. 42:8-42:10.)  Further, counsel asserted that Deka had been appointed as lead counsel in four other cases.  (Tr. 42:21-43:2.)  Based upon these representations, this Court is satisfied that Deka is not simply an investment advisor, but rather has "complete investment authority over its trades, and is agent and attorney-in-fact with full power and authority to act in connection with its investments."  <u>Roth</u>, 228 F. Supp. 2d at 529.

<u>*Investigation into financial irregularities – Deka*</u>

Upham alleges that "DekaBank, Deka's parent corperation [sic], is under investigation by German authorities for financial irregularities in certain of its funds."  (Reply Mem. 10.)  This allegation is based on information contained in DekaBank's 2004 Annual Report and a news

article from the October 8, 2004, issue of Property Week.

The annual report refers to two problems with one of DekaBank's investment funds: (1) the dismissal in August 2004 of one of Deka Immobilien Investment's[12] managing directors due to the disclosure of financial irregularities, following an investigation by German prosecutors into several suspects across the property sector, and (2) a special audit of Deka Immobilien Investment ordered by German banking regulator BaFin into the potential damage to investors caused by the irregularities that led to the dismissal of the managing director. (Annual Report 2004 DekaBank Deutsche Girozentrale 4, 7, attached as Ex. D to Decl. of Leslie R. Stern, Esq. in Further Support of Richard Upham's Mot. to Consolidate Actions, to be Appointed Lead Pl. and for Approval of Lead Pl.'s Selection of Lead Counsel and Liaison Counsel, hereinafter "DekaBank Annual Report".) The article in Property Week reported that "German fund manager Deka is facing a massive withdrawal of money from its main investment fund following the corruption scandal which has hit the German property market. . . . Along with other German fund managers, Delta [sic] was already suffering outflows of money from its funds even before the scandal broke, because of the poor performance of the German property market." Tim Danaher & Ellen Bennett, *Deka haemorrhages cash after scandal: Frankfurt corruption troubles cast cloud over Expo Real in Munich*, 69 PROP. WK. 3 (Oct. 8, 2004).

This Court's reading of the excerpt from the annual report and the Property Week article differs from Upham's counsel's assertion that DekaBank is currently being investigated. Rather

---

[12] Deka Immobilien Investments is "the market leader in open-ended property funds." (Annual Report 2004 DekaBank Deutsche Girozentrale 4, attached as Ex. D to Decl. of Leslie R. Stern, Esq. in Further Support of Richard Upham's Mot. to Consolidate Actions, to be Appointed Lead Pl. and for Approval of Lead Pl.'s Selection of Lead Counsel and Liaison Counsel ("DekaBank Annual Report").) While not stated explicitly in the excerpt provided to this Court, it appears that Deka Immobilien Investments is a subsidiary of DekaBank. (*Id.*)

than a current investigation into Deka's parent, the German prosecutor, in 2004, was

investigating  "several suspects across the entire property sector," including another fund, not the

party here, managed by DekaBank.  (DekaBank Annual Report 4.)  During oral argument, Deka's

counsel confirmed that another fund, Deka-ImmobilienFonds,[13] and not Deka (Ireland), the party

here, was under investigation in 2004 and had problems with excessive withdrawals by investors

at that time.  Further, counsel for Deka assured this Court that the irregularities with the real

estate subsidiary ended in September 2004 when the management board of Deka-

ImmobilienFonds was replaced.  (Tr. 46:17-46:23.)  In fact, "[t]here's never been an

investigation of Deka Bank."  (Tr. 48:23.)

Citing In re Network Assocs., Inc. Securities Litig., 76 F.Supp.2d 1017 (N.D. Cal. 1999),

Upham argues that the investigation into another subsidiary of Deka's parent company renders

Deka inadequate to serve as lead plaintiff.  (Reply Mem. 11.)  This Court finds Network Assocs.

distinguishable.  In Network Assocs., the court concluded that an equity fund that owned two

banks was not an adequate lead plaintiff because the two banks were under investigation for

criminal fraud, and the CEO of one bank had been arrested for tax evasion, fraud, money

laundering conspiracy and consorting with criminal elements.  Id. at 1029.  Based on these facts,

the court was "unwilling to install an enterprise under such a cloud in a position of trust and

confidence.  [The fund] is otherwise preoccupied with its own legal problems."  Id.  Here, neither

Deka, nor its parent or subsidiary, is currently under investigation.  Additionally, there is no

indication of an ongoing criminal investigation that would distract Deka from focusing on this

---

[13]  The excerpt from the DekaBank Annual Report appears to refer to Deka-
ImmobilienFonds and Deka Immobilien Investment interchangeably.  (DekaBank Annual Report
4.)

class action litigation.

The other case Upham relies upon, <u>Hall v. Nat'l Recovery Systems, Inc.</u>, No. 96-132-Civ-T-17(C), 1996 WL 467512 (M.D. FL Aug. 9, 1996), is even farther off point.  In that case, the individual seeking to serve as lead plaintiff in a non-securities based class action had been convicted of various crimes.  In his deposition, he lied about some of these convictions, one of a number of factors the court found indicative of his lack of honesty and concurrent inability to serve as lead plaintiff.  <u>Id.</u> at *5.  There is no indication that Deka has lied to this Court or been convicted of any criminal activity.  Given the information before this Court, it does not appear that there is any impediment to Deka serving as co-lead plaintiff.  Had there been any evidence before this Court of an ongoing criminal investigation into Deka itself, or had there been any indication that Deka had lied to this Court, this Court would have reached a different conclusion.  Lacking any hint of impropriety on the part of Deka, this Court concludes that Deka may serve as co-lead plaintiff.

### <u>Selection of lead counsel</u>

The PSLRA provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(v).  The Third Circuit has observed that "the power to 'select and retain' lead counsel belongs, at least in the first instance, to the lead plaintiff, and the court's role is confined to deciding whether to 'approv[e]' that choice."  <u>Cendant</u>, 264 F.3d at 273.

In her declaration, Ms. Halliday described the thorough process DERP used to select Grant & Eisenhofer P.A. as lead counsel and negotiate a fee deal.  (Decl. of Victoria Halliday ¶ 5.)  Murray, Frank and Sailer LLP, counsel for Deka has agreed to abide by this fee agreement.  (<u>Id.</u>; Decl. of Grainne Walsh ¶ 9.)  Since it appears to this Court that the IIG, the lead plaintiff,

has carefully selected qualified counsel, this Court will not disturb that choice.

**Conclusion**

      For the reasons set forth above, this Court concludes that the IIG, consisting of Deka and DERP, is the presumptive lead plaintiff, and that Upham's attempts to rebut this presumption fail.  This Court shall also approve the IIG's selection of Grant & Eisenhofer P.A. and Murray, Frank and Sailer LLP as co-lead counsel.

Dated: April 3, 2006

                              S/Joseph A. Greenaway, Jr.
                              JOSEPH A. GREENAWAY, JR., U.S.D.J.

19