Stuart M. Grant
Megan D. McIntyre
James R. Banko
GRANT & EISENHOFER P.A.
1201 North Market Street
Wilmington, Delaware  19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100
*Co-Lead Counsel for*
*Lead Plaintiffs and the Class*

Kevin P. Roddy
WILENTZ, GOLDMAN
  & SPITZER, P.A.
90 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, New Jersey  07095
Telephone: (732) 636-8000
Facsimile: (732) 726-6686
*Local Counsel for*
*Lead Plaintiffs and the Class*

Thomas A. Dubbs
Ira A. Schochet
David J. Goldsmith
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
*Co-Lead Counsel for*
*Lead Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IN RE ABLE LABORATORIES SECURITIES LITIGATION | : : : : : : : | Master File No. 05-CV-2681 (GEB) (MCA)<br><br>Hearing Date: June 16, 2010, at 1:00 p.m. (per Order dated February 24, 2010) |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF SETTLEMENT,
AND FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .............................................................................................. 1

FACTUAL BACKGROUND ............................................................................... 4

    A.    Summary of Lead Plaintiffs' Claims ................................................... 4

    B.    The Status of the Litigation ............................................................... 5

    C.    The Settlement .................................................................................. 7

    D.    The Preliminary Approval Order and Notice to the Class ................. 10

    E.    The Plan of Allocation of the Net Settlement Fund ........................... 11

ARGUMENT ................................................................................................... 13

I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE
    AND ADEQUATE AND SHOULD BE APPROVED ................................. 13

    A.    Standards for Approval of Class Action Settlements ......................... 13

    B.    The Settlement Negotiations Were Undertaken at
         Arm's-Length and Without a Hint of Collusion ................................. 15

    C.    The Settlement Is Fair, Reasonable and Adequate ........................... 16

         1.    Continued Litigation Would Be
             Long, Complex and Expensive .................................................. 17

         2.    The Class Supports the Settlement ........................................... 18

         3.    Settlement at This Stage of
             the Proceedings Is Appropriate ................................................. 19

         4.    Plaintiffs Would Face Considerable
             Risks in Establishing Liability at Trial ..................................... 20

         5.    Plaintiffs Face Risks in Establishing Damages ......................... 24

i

6.      The Risks of Maintaining the
        Class Action Through Trial ......................................................25

7.      Defendants' Ability to
        Withstand a Greater Judgment..................................................26

8.      The Reasonableness of the Settlement
        in Light of the Best Possible Recovery
        and All Attendant Risks of Litigation........................................27

II.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS.............28

III.   THE COURT SHOULD APPROVE THE PLAN OF
       ALLOCATION OF THE NET SETTLEMENT FUND ..............................28

IV.    THE COURT SHOULD GRANT CLASS COUNSEL'S
       APPLICATION FOR ATTORNEY'S FEES AND EXPENSES .................31

CONCLUSION ....................................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*In re Aetna Securities Litigation,*
No. Civ. A. MDL 1219,
2001 WL 20928 (E.D. Pa. Jan. 4, 2001)...........................................................29

*In re Apollo Group, Inc. Securities Litigation*,
No. 04-2147 PHX-JAT, 2008 WL 3072731
(D. Ariz. Aug. 4, 2008)........................................................................................20

*In re AT&T Corp.*,
455 F.3d 160 (3d Cir. 2006) ...........................................................16, 31, 32, 36

*Barnes v. American Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998) ..............................................................................25

*Bayshore Ford Truck v. Ford Motor Co.,*
No. 99-741 (JLL), 2010 WL 415329
(D.N.J. Jan. 29, 2010) ........................................................................................25

*Bell Atlantic Corp. v. Bolger*,
2 F.3d 1304 (3d Cir. 1993) .................................................................................18

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980).............................................................................................31

*In re Bristol-Myers Squibb Securities Litigation*,
No. 06-2964, 2007 WL 2153284
(3d Cir. July 27, 2007) ........................................................................................34

*In re Cendant Corp. Litigation*,
264 F.3d 201 (3d Cir. 2001) ...............................................................19, 33, 34

*In re Cendant Corp. PRIDES Litigation*,
243 F.3d 722 (3d Cir. 2001) ..............................................................................37

*Chemi v. Champion Mortgage*,
   No. 05-CV-I238 (WHW),
   2009 WL 1470429 (D.N.J. May 26, 2009)........................................................38

*In re Diet Drugs*,
   582 F.3d 524 (3d Cir. 2009) .......................................................................31, 33

*In re Digital Island Securities Litigation*,
   357 F.3d 322 (3d Cir. 2004) ..............................................................................21

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)....................................................................................20, 21

*In re General Motors Corp. Pick-Up Truck*
*Fuel Tank Products Liability Litigation*,
   55 F.3d 768 (3d Cir. 1995) ........................................................................ *passim*

*In re Genta Securities Litigation*,
   No. 04-2123 (JAG), 2008 WL 2229843
   (D.N.J. May 28, 2008) ......................................................................................24

*In re Gilat Satellite Networks, Ltd.*,
   No. CV 02-1510, 2007 WL 1191048
   (E.D.N.Y. Apr. 19, 2007) .................................................................................29

*Girsh v. Jepson*,
   521 F.2d 153 (3d Cir. 1975) ................................................................16,17, 20

*In re Global Crossing Securities & ERISA Litigation*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................28, 29

*Gunter v. Ridgewood Energy Corp.*,
   223 F.3d 190 (3d Cir. 2000) ......................................................................32, 33

*In re Ikon Office Solutions, Inc. Securities Litigation*,
   194 F.R.D. 166 (E.D. Pa. 2000)........................................................................28

*In re Initial Public Offering Securities Litigation*,
   226 F.R.D. 186 (S.D.N.Y. 2005) ......................................................................16

*In re Insurance Brokerage Antitrust Litigation,*
   579 F.3d 241 (3d Cir. 2009) ......................................................13, 37

*In re Janney Montgomery Scott LLC*
   *Financial Consultant Litigation*,
   No. 06-3202, 2009 WL 2137224
   (E.D. Pa. July 16, 2009).............................................................38

*Lake v. First Nationwide Bank*,
   900 F. Supp. 726 (E.D. Pa. 1995)............................................14, 17

*Lazy Oil Co. v. Witco Corp.*,
   166 F.3d 581 (3d Cir. 1999) ..........................................................13

*Lazy Oil Co. v. Witco Corp.*,
   95 F. Supp. 2d 290 (W.D. Pa. 1997),
   *aff'd,* 166 F.3d 581 (3d Cir. 1999)..................................................27

*Louisiana Municipal Police Employees'*
   *Retirement System v. Sealed Air Corp.*,
   No. 03-CV-4372 (DMC), 2009 WL 4730185
   (D.N.J. Dec. 4, 2009) ........................................................34, 37, 38

*In re Lucent Technologies Inc. Securities Litigation*,
   327 F. Supp. 2d 426 (D.N.J. 2004)..........................................34, 35

*Mehling v. New York Life Insurance Co.*,
   248 F.R.D. 455 (E.D. Pa. 2008).....................................................28

*In re Merck & Co., Inc. Vytorin ERISA Litigation*,
   No. 08-CV-285 (DMC), 2010 WL 547613
   (D.N.J. Feb. 9, 2010) ....................................................................28

*Officers for Justice v. Civil Service Commission*
   *of the City and County of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) .........................................................15

*In re Omnicom Group, Inc. Securities Litigation*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008) ............................................24

*Osio v. DeMane*,
   No. 05-2283 (JLL), 2006 WL 2129460
   (D.N.J. July 24, 2006)...........................................................................................22

*In re PaineWebber Limited Partnerships Litigation*,
   171 F.R.D. 104 (S.D.N.Y.),
   *aff'd*, 117 F.3d 721(2d Cir. 1997).......................................................................24

*In re Pet Food Products Liability Litigation*,
   No. 07-2867 (NLH), 2008 WL 4937632
   (D.N.J. Nov. 18, 2008).........................................................................................19

*In re Prudential Insurance Co. of America
   Sales Practices Litigation*,
   962 F. Supp. 450 (D.N.J. 1997),
   *aff'd*, 148 F.3d 283 (3d Cir. 1998)............................................................. *passim*

*In re Rite Aid Corp. Securities Litigation*,
   396 F.3d 294 (3d Cir. 2005) ...........................................................................32, 36

*Robbins v. Koger Properties*,
   116 F.3d 1441 (11th Cir. 1997) ......................................................................24, 25

*In re Safety Components, Inc. Securities Litigation*,
   166 F. Supp. 2d 72 (D.N.J. 2001)...................................................................37, 38

*SEC v. Infinity Group*,
   212 F.3d 180 (3d Cir. 2000) ................................................................................21

*In re Sterling Financial Corp.
   Securities Class Action*,
   No. 07-2171, 2009 WL 2914363
   (D.N.J. Dec. 4, 2009) ......................................................................................34, 37

*In re StockerYale Inc. Securities Litigation*,
   No. 05-cv-00177 SM,
   2007 WL 4589772 (D.N.H. Dec. 18, 2007) ........................................................16

*Stoetzner v. U.S. Steel Corp.*,
   897 F.2d 115 (3d Cir. 1990) ................................................................................18

*Stoneridge Investment Partners, LLC*
    *v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008)..............................................................................23

*In re Suprema Specialties, Inc. Securities Litigation*,
    438 F.3d 256 (3d Cir. 2006) ...............................................................23

*Walsh v. Great Atlantic & Pacific Tea Co.*,
    726 F.2d 956 (3d Cir. 1983) ...............................................................28

*Weber v. Government Employment Insurance Co.*,
    262 F.R.D. 431 (D.N.J. 2009)........................................................17, 18

*Weiss v. Mercedes-Benz of North America, Inc.*,
    899 F. Supp. 1297 (D.N.J.),
    *aff'd*, 66 F.3d 314 (3d Cir. 1995)..............................................13, 14, 20

*West Virginia v. Chas. Pfizer & Co.*,
    314 F. Supp. 710 (S.D.N.Y. 1970),
    *aff'd*, 440 F.2d 1079 (2d Cir. 1971)....................................................20

*In re WorldCom, Inc. Securities Litigation*,
    No. 02 Civ. 3288 (DLC),
    2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004)...........................15, 16

## STATUTES & RULES

15 U.S.C. § 78j................................................................................4

15 U.S.C. § 78r...............................................................................4

15 U.S.C. § 78t...............................................................................4

15 U.S.C. § 78t-1 ...........................................................................4

15 U.S.C. § 78u-4(b)(3) ................................................................6

17 C.F.R. § 240.10b5-1.............................................................6, 21

Fed. R. Civ. P. 23(c)(1) ............................................................................25

## OTHER AUTHORITIES

Herbert Newberg & Alba Conte, Newberg on Class Actions
   § 11.51 (4th ed. 2002) ........................................................................15

George E. Jordan, *The Drug company and the bogus data;*
   *Able Labs put out bad pills in front of FDA for years,*
   THE STAR-LEDGER, Aug. 7, 2005 .......................................................22

# INTRODUCTION

Lead Plaintiffs Denver Employees Retirement Plan ("DERP") and Deka International (Ireland) Limited ("Deka") (together, "Lead Plaintiffs"), on behalf of themselves and the members of the proposed class (the "Class") in this securities class action (the "Action"), respectfully submit this memorandum of law in support of their motion for final approval of the proposed settlement (the "Settlement") of the Action and the Plan of Allocation of the Net Settlement Fund, and for an award of attorneys' fees and expenses to the law firms that served as Co-Lead Counsel to the Class, Grant & Eisenhofer P.A. and Labaton Sucharow LLP ("Class Counsel").

This action arises out of the demise of Able Laboratories, Inc. ("Able"), a generic drug manufacturer that was forced into bankruptcy, rendering its stock worthless, following revelations of its non-compliance with standard operating procedures in its laboratories.  Lead Plaintiffs allege that Dhananjay Wadekar, Robert Mauro, Shashikant Shah, Garth Boehm, and Iva Klemick (collectively, the "Defendants"), all of whom are former officers or directors of Able, violated the federal securities laws by misrepresenting and concealing the truth regarding deficiencies in Able's quality controls, causing artificial inflation in the price at which investors purchased Able common stock.  When the truth was revealed and the price inflation was eliminated, investors who had purchased Able stock at inflated prices (*i.e.*, the members of the Class) suffered significant losses.

The Settlement is the product of good faith, arm's-length negotiations among experienced counsel, which took place over a period of more than a year under the auspices of a professional private mediator, a U.S. Magistrate Judge, and, ultimately, then-presiding U.S. District Judge (now Circuit Judge) Joseph A. Greenaway, Jr.  Pursuant to the Settlement, Defendants will cause their directors' and officers' (D&O) liability insurance carriers to pay $9,150,000.00 in cash (the "Settlement Fund") in return for the dismissal of the Action in its entirety and the release of all Released Claims, as defined in the parties' Stipulation and Agreement of Settlement dated December 30, 2009 (the "Settlement Agreement").[1]  The Settlement Fund, after deduction of Class Counsel's fees and expenses, notice and administration costs, and taxes, will be shared by the members of the Class in this Action and the members of the plaintiff class in a separate action brought on behalf of consumers of Able drugs (the "Consumer Class"),[2] with the majority of the consideration expected to go to the Class in this Action.  The Settlement further provides for the possibility of up to an additional $1,125,000 in payments to the Class – not to be shared with the Consumer Class – if sufficient funds remain after the payment of certain future legal costs from a reserve ("Reserve") established in

---

[1] The Settlement Agreement was filed with the Court on January 4, 2010 (Dkt. No. 209).  All capitalized terms that are not defined herein have the same meanings as set forth in the Settlement Agreement.

[2] The consumer class action is *Elnora Kirtley, et al. v. Dhananjay G. Wadekar, et al.*, Case No. 05-CV-5383 (D.N.J.) (the "Consumer Class Action").

connection with the Settlement.  Notice of the Settlement has been provided to the Class in the manner directed by Judge Greenaway, and there are no objections.

Additionally, Class Counsel seek – and Lead Plaintiffs support – an award of attorneys' fees and expenses to be paid to them from the Settlement Fund.  Class Counsel is requesting a fee of 12% of the Settlement Fund, *i.e.*, between $1,098,000 and $1,233,000, depending on the amount of the Reserve that is ultimately paid to the Class.  This request should be approved because it is based on a fee agreement entered at the outset of the case between Lead Plaintiffs (both of which are sophisticated institutional investors) and Class Counsel; it is at the low end of the range of fee awards approved in similar cases; and it is only about ***half*** the "lodestar" value of the time Class Counsel spent working on the case. Class Counsel's expenses of $180,436.12 are likewise reasonable and should be fully reimbursed.[3]

---

[3] Counsel for the Consumer Class negotiated a separate fee in the amount of $600,000, which is not payable from the Settlement Fund.  The full amount of the settlement that was negotiated in this Securities Action and the Consumer Action is $9.75 million, with $600,000 in fees payable to Consumer Class counsel.  Because those fees come "off the top" (unlike Class Counsel's fees, which are a percentage of the Settlement Fund) and have nothing to do with this Action, they are excluded from the definition of the "Settlement Fund" in the Settlement Agreement in this Action.  It has recently come to Class Counsel's attention that there is a mistake in the settlement agreement in the Consumer Action, purporting to state that the fee to counsel for the Consumer Class would be payable out of the $9.15 million Settlement Fund.  Class Counsel understands that Consumer Class counsel and Defendants have agreed upon a plan to resolve this issue whereby Consumer Class counsel will file an unopposed motion asking this Court, pursuant to its equitable

## FACTUAL BACKGROUND

**A.    Summary of Lead Plaintiffs' Claims**

On behalf of a Class consisting of all persons or entities who purchased or otherwise acquired Able common stock between October 30, 2002 and May 18, 2005, inclusive (the "Class Period"), Lead Plaintiffs assert securities fraud claims against Defendants who are former officers or directors of Able, a now-defunct generic drug manufacturer.  Able itself was not named as a defendant due to its bankruptcy filing in July 2005.

Lead Plaintiffs allege that Defendants violated the Securities Exchange Act of 1934 (the "1934 Act") by making material false statements and omissions to investors regarding Able's purported compliance with U.S. Food and Drug Administration ("FDA") quality control mandates, and by engaging in a fraudulent scheme to conceal from investors the deficiencies in Able's quality controls.[4]

---

powers under Rule 23 of the Federal Rules of Civil Procedure, to direct the four defendants who are named in both the Consumer and Securities Actions to pay an additional $600,000 into the Settlement Fund.  Lead Plaintiffs and Class Counsel will not oppose this motion, as it is consistent with the original terms upon which all parties agreed and which Judge Greenaway memorialized at the end of the last mediation session.  In particular, payment of the fee to Consumer Class Counsel will not in any way reduce the $9.15 million Settlement Fund, a result to which Lead Plaintiffs here had not agreed and that they understand is not now contemplated nor requested by any party.

[4] Lead Plaintiffs assert that Defendants Wadekar, Mauro, and Shah violated Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  Lead Plaintiffs also assert that Wadekar violated Section 18 of the 1934 Act, 15 U.S.C. § 78r, and that Wadekar

Specifically, Lead Plaintiffs allege that Able obtained FDA approvals for its products through falsification and manipulation of test results and submission of incomplete and inaccurate reports to the FDA, and that Able persistently failed to comply with FDA regulations and statutes governing testing, manufacture, labeling, storage, record keeping, drug approval, and quality control.  By concealing these facts and portraying the Company to investors as a "turnaround" story with triple-digit growth in revenues and earnings, the Defendants caused the Company's stock price to be artificially inflated throughout the Class Period.

On May 19, 2005, the day after its stock reached an all-time high of $26.49 per share, Able announced that an internal investigation had identified "apparent departures from standard operating procedures with respect to certain laboratory testing practices."  As a result, the Company announced that it was suspending the sales of all of its products.  By the end of 2005, Able had recalled all of its products, permanently shut down its operations, and liquidated its assets in bankruptcy.  These events rendered the Company's stock worthless.

**B.**     <u>**The Status of the Litigation**</u>

Between May 23, 2005 and July 5, 2005, nine securities class action complaints were filed against Able and various of its officers and directors.  Those

---

and Shah engaged in insider trading in violation of Section 20A of the 1934 Act, 15 U.S.C. § 78t-1.  In addition, Lead Plaintiffs assert that all Defendants are liable as "controlling persons" of Able pursuant to Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a).

actions were consolidated into this Action on January 25, 2006.  On March 17, 2006, Judge Greenaway appointed Lead Plaintiffs to prosecute the Action on behalf of the Class and appointed the law firms of Grant & Eisenhofer P.A. and Murray Frank & Sailer LLP as co-lead counsel to represent the Class.  With the Court's approval, the law firm of Labaton Sucharow LLP was later substituted for Murray Frank & Sailer LLP.

Lead Plaintiffs filed a Consolidated Class Action Complaint on June 19, 2006, and the Defendants responded by moving to dismiss Lead Plaintiffs' claims on a variety of grounds.  By Order dated June 29, 2007, after extensive briefing and oral argument, Judge Greenaway denied Defendants' motions to dismiss in their entirety.  Defendants filed four motions for reconsideration of that decision, which the Court denied on March 24, 2008.  Pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B), discovery was stayed pending resolution of the motions to dismiss.

By the time the motions to dismiss were resolved and Lead Plaintiffs were able to commence discovery, Able had been in bankruptcy for more than two years and Lead Plaintiffs and Class Counsel were aware that Defendants' D&O insurance coverage was limited to $25 million and was a "wasting" policy – *i.e.*, it was being depleted by defense costs.  Given that Defendants were represented by three prominent law firms, Lead Plaintiffs and Class Counsel recognized that the

funds available to pay a settlement or judgment would be quickly exhausted if the litigation were to continue into full-blown discovery.  Even worse, the Class in this Action was not the only claimant to those insurance proceeds, because separate actions had been filed and were pending against former Able officers and directors by Able's bankruptcy trustee and by the Consumer Class.  Not only could a judgment in favor of those plaintiffs implicate the insurance proceeds, but the Defendants' legal costs in those actions were further contributing to the depletion of those proceeds.  Additionally, certain former Able officers faced criminal investigations or charges, and had asserted claims for insurance coverage of their expenses relating to those proceedings.

Given the limited resources available to pay a judgment or settlement, and the fact that those resources would be swiftly diminished by continued litigation, Lead Plaintiffs secured the agreement of the plaintiffs in the other two actions to participate in a joint mediation with the Defendants and their insurance carriers in an effort to reach a global settlement.  The parties agreed to an informal stay of the Action so the parties could pursue these settlement discussions.

## C.    The Settlement

The settlement negotiations were a long and arduous process, whose complexity was enhanced by the limited resources available to fund a settlement, by the competing demands to those monies by three sets of plaintiffs, and by the

D&O insurance carriers' assertion of numerous coverage defenses.  The initial

settlement discussions were facilitated by an experienced private mediator, David

Geronemus, Esq. of JAMS, with separate sessions taking place on January 23 and

24 and February 6, 2008.  When those multiple efforts did not result in a

settlement, Magistrate Judge Madeline Cox Arleo conducted two further settlement

conferences – on May 13 and October 29, 2008.  Those conferences brought the

parties closer together but still did not produce a settlement.  It was not until the

parties attended a day-long settlement conference before Judge Greenaway and

Magistrate Judge Arleo jointly on March 12, 2009 that they finally were able to

bridge the gap between them, and a global agreement-in-principle was reached,

covering all three cases.  Judge Greenaway and Magistrate Judge Arleo were

instrumental in brokering an agreement that maximized the total proceeds available

to fund these settlements, and in facilitating an allocation of the proceeds among

the three cases.

Judge Greenaway himself placed the essential terms of the global settlement

on the record at the conclusion of the final settlement conference.  *See* Transcript

of Proposed Settlement dated March 12, 2009, at 3-6 (attached as Exhibit 1 to

accompanying Declaration of Megan D. McIntyre ("McIntyre Decl.")).  First, the

D&O insurance carriers would pay $13.75 million, of which $4 million would be

paid to settle the bankruptcy trustee's case, $600,000 would be paid as a fee award

to Consumer Class counsel, $250,000 would be applied toward the costs of

providing notice to the Securities and Consumer Classes and administering the

Settlement, Class Counsel would receive fees equal to 12% of the settlement

amount (approximately $1.1 million), and the balance – roughly $7.8 million –

would be allocated to the members of the Class and the Consumer Class.  *Id.*

Second, the D&O carriers would establish a $4.5 million reserve (the "Reserve")

for the payment of certain future defense costs to be incurred by their insureds, and

any unused balance of that Reserve would be paid 25% to the Class (not to be

shared with the Consumer Class) and 25% to the bankruptcy trustee.[5]  *Id.*

Once this global accord was reached, the parties set about drafting separate

settlement agreements in the three cases.  After extensive negotiations, the formal

Settlement Agreement in this Action was executed on December 30, 2009 and filed

with the Court on January 4, 2010.  The Settlement Agreement sets forth those

terms of the global settlement that are applicable to this Action – *i.e.*, payment of

$9.15 million[6] (the "Settlement Amount") in cash into an escrow account for the

benefit of the members of the Class (to be shared with the Consumer Class, after

deduction of notice and administration expenses, Class Counsel's fees and

---

[5] The remaining 50% of any unused balance in the Reserve will revert to the insurance carriers.

[6] $13.75 million total payments, minus $4 million to be allocated to the bankruptcy trustee, minus $600,000 in fees for the Consumer Class counsel, equals $9.15 million.

expenses, and taxes), and payment of 25% of any unused balance of the Reserve into an escrow account for the benefit of the Class.  In consideration of these payments, this Action will be dismissed with prejudice, and Lead Plaintiffs and all members of the Class will grant releases in favor of the Defendants and certain other former officers and directors of Able who were insured under the same insurance policy.

**D.    The Preliminary Approval Order and Notice to the Class**

Judge Greenaway entered an Order preliminarily certifying the Class and preliminarily approving the Settlement on February 24, 2010.  In accordance with that order, Class Counsel and the Claims Administrator undertook reasonable measures to identify the members of the Class, including by obtaining a list of Class Period purchasers from Able's transfer agent and by contacting more than 2,400 brokerage firms and other nominees to request the identities of their account holders who purchased Able stock during the Class Period.  *See* Affidavit of Stephen J. Cirami Regarding Dissemination of the Notice and Proof of Claim ("Cirami Aff.") ¶¶ 3-6; McIntyre Decl. ¶ 12.  In total, the Claims Administrator mailed more than 32,000 copies of the Court-approved Notice of Pendency and Proposed Settlement of Class Action and Fairness Hearing (the "Notice") and Proof of Claim form to potential Class members.  Cirami Aff. ¶ 11.  The summary version of the notice (the "Summary Notice") was also published in *Investor's*

*Business Daily* on March 11, 2010, as directed by the Preliminary Approval Order. *Id*. ¶ 8 &  Ex. B thereto.  Finally, the Claims Administrator established a toll-free telephone number dedicated to assisting Class members, and the Notice was posted on the Claims Administrator's and Class Counsel's websites.  *Id*. ¶¶ 7, 9; McIntyre Decl. ¶¶ 10, 11.

No objections to the Settlement, the Notice, or Class Counsel's fee or expense application have been filed with the Court or otherwise received.  Cirami Aff. ¶ 13; McIntyre Decl. ¶ 25.  While two requests for exclusion from the Class have been received, one of the individuals seeking exclusion did not purchase any Able stock during the Class Period, and thus is not a Class member in any event. The other individual requested exclusion because he realized a gain on the Able stock he purchased during the Class Period and, therefore, has no claim for damages.  Cirami Aff. ¶ 12 & Ex. C thereto; McIntyre Decl. ¶ 26.  Thus, no Class member who suffered a recoverable loss has requested exclusion.

**E.**     **The Plan of Allocation of the Net Settlement Fund**

While the cases are governed by separate settlement agreements, Class Counsel and counsel for the Consumer Class negotiated a joint proposed plan of allocation (the "Plan of Allocation" or "Plan"), because the members of both classes will be sharing a single pool of money.  The Plan of Allocation, which provides for the means of allocating the Settlement proceeds among and between

11

members of the Class and the Consumer Class, was set forth in the Notice sent to

the Class.  *See* Notice at 7-8 (Cirami Aff. Ex. A).  No one has objected to the Plan.

The Plan of Allocation sets forth a means to calculate the "Recognized

Loss" of each Class and Consumer Class member who submits a valid proof of

claim, and provides that the Net Settlement Fund (*i.e.*, the Settlement Fund less

Class Counsel's attorneys' fees and expenses, notice and administration expenses,

and taxes) will be distributed *pro rata* based on the amount of a claimant's

Recognized Loss compared to the total Recognized Losses of all claimants.  In

other words, each member of the Class and Consumer Class who submits a timely

and valid proof of claim will receive the same percentage of its Recognized Loss,

and that percentage will depend on the total value of all the claims submitted.

Because the value of the individual claims submitted by Class members (losses on

investments in securities that suffered a material decline) are expected to be of

greater magnitude than those submitted by Consumer Class members (occasional

or periodic purchasers of Able drugs), Lead Plaintiffs expect that a majority of the

Net Settlement Fund will be paid to members of the Class in this Action.

The formula for calculating Class members' Recognized Losses was

developed by Class Counsel in conjunction with a damages expert, and reflects

Lead Plaintiffs' allegations that the revelations of Defendants' alleged

misrepresentations and omissions corrected and removed the artificial inflation

12

from Able's stock.  *See* McIntyre Decl. ¶ 24.  Class members who purchased Able

stock during the Class Period and sold it prior to the corrective disclosures will

have a Recognized Loss equal to one-tenth of their out-of-pocket losses, reflecting

the lesser value of claims as to those transactions, while those who continued to

hold their shares at the time of the corrective disclosures will have a Recognized

Loss equal to the decline in Able's stock price following that disclosure (or the full

amount of their out-of-pocket loss, if that amount is lower).  *See* Notice at 7-8

(Cirami Aff. Ex. A).

## ARGUMENT

## I.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED

### A.   Standards for Approval of Class Action Settlements

A settlement of a class action will be approved under Rule 23(e) if it is "fair,

reasonable and adequate."  *In re Insurance Brokerage Antitrust Litig.*, 579 F.3d

241, 258 (3d Cir. 2009) (citing *In re Prudential Ins. Co. of Am. Sales Practices

Litig.*, 962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283, 316 (3d Cir. 1998)).

"Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is

executed by the court's assuring the settlement represents adequate compensation

for the release of the class claims."  *Id.*

A number of principles and factors guide the Court's review of the

Settlement.  First, approval of a proposed class action settlement is a matter within

the sound discretion of the court. *See Weiss v. Mercedes-Benz of N. Am., Inc.*, 899 F. Supp. 1297, 1300 (D.N.J. 1995), *aff'd*, 66 F.3d 314 (3d Cir. 1995). The Third Circuit "will reverse a [class action] settlement approval only when the district court has committed a 'clear abuse of discretion.'" *Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 587 (3d Cir. 1999) (citations omitted).

Second, "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("*GM Trucks*"). Judge Bissell has articulated the rationale for that policy as follows:

> [W]hen parties negotiate a settlement they have far greater control of their destiny than when a matter is submitted to a jury. Moreover, the time and expense that precedes the taking of such a risk can be staggering. This is especially true in complex commercial litigation.

*Weiss*, 899 F. Supp. at 1300-01.

Third, a class action settlement is presumed to be reasonable where, as here, it is the product of arm's-length negotiations conducted by experienced counsel, with few (or no) objections. *See GM Trucks*, 55 F.3d at 785 (there is "an initial presumption of fairness when the court finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the

14

class objected").  In these circumstances, "[s]ignificant weight should be attributed to the belief of experienced counsel that the settlement is in the best interest of the class."  *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) (internal quotation marks omitted).

Fourth, the court should avoid substituting its image of an "ideal settlement" for the views of the compromising parties, and must keep in mind that a settlement is, after all, "a compromise, a yielding of the highest hopes in exchange for certainty and resolution."  *Prudential*, 962 F. Supp. at 534 (citations omitted); *see also Officers for Justice v. Civil Serv. Comm'n of the City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) ("The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.").

Applying these principles and factors, the Settlement should be approved.

### B.    The Settlement Negotiations Were Undertaken at Arm's-Length and Without a Hint of Collusion

As noted above, a proposed settlement is presumed fair and reasonable when it is the result of arm's-length negotiations among experienced counsel, whose opinion is generally given considerable weight.  Moreover, "courts presume . . . the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered."  4 Herbert Newberg & Alba Conte, Newberg on Class Actions § 11.51, at 158 (4th ed. 2002).

Here, the record shows that the Settlement is the product of non-collusive negotiations conducted by well-informed and highly experienced counsel. McIntyre Decl. ¶ 6-9.[7]  An agreement was reached only after years of contentious negotiations, and with the assistance of two sitting judges.  *Id*.  *See In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 2591402, at *10 (S.D.N.Y. Nov. 12, 2004) (finding no collusion where the "settlement was the result of extensive arm's-length negotiations, supervised at critical junctures by two experienced judicial officers"); *In re StockerYale Inc. Sec. Litig.*, No. 05-cv-00177 SM, 2007 WL 4589772, at *3 (D.N.H. Dec. 18, 2007) (approving settlement where, among other things, it "was reached after significant negotiations between the parties before an experienced mediator"); *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 194 (S.D.N.Y. 2005) (where negotiations were facilitated by former judge, settlement was "clearly the result of arm's-length bargaining").  The Settlement therefore enjoys an initial presumption of fairness.  As discussed below, there is no basis to rebut that presumption.

### C.      The Settlement Is Fair, Reasonable and Adequate

The Third Circuit has adopted a set of nine factors to be considered in determining whether a proposed settlement is fair, reasonable and adequate:

---

[7] For a summary of Lead Counsel's qualifications, *see* Exhibits 4 and 7 to the McIntyre Declaration.

> (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action [through trial]; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re AT&T Corp.*, 455 F.3d 160, 164-65 (3d Cir. 2006). These factors –

sometimes called the "*Girsh*" factors because they were first adopted in *Girsh v.*

*Jepson*, 521 F.2d 153 (3d Cir. 1975) – further support approval of the Settlement.

### 1.    Continued Litigation Would Be Long, Complex and Expensive

Courts have consistently held that the expense and possible duration of

litigation are factors to be considered in evaluating a settlement. "By measuring

the costs of continuing on the adversarial path, a court can gauge the benefit of

settling the claim amicably." *Weber v. Government Empl. Ins. Co.*, 262 F.R.D.

431, 444 (D.N.J. 2009); *see also Lake*, 900 F. Supp. at 732 (approving settlement

where, "due to the relative complexity of the issues involved and the amount of

data that would need to be processed, the costs of litigating th[e] matter through

trial would likely be high"); *GM Trucks*, 55 F.3d at 812 (lengthy discovery and

ardent opposition from the defendant were facts favoring settlements, which offer

immediate benefits and avoid delay and expense). Here, continued litigation of

17

this matter would not only be long, complex and expensive, but it also would effectively strip the Class of any meaningful recovery on its damages claims.

The five-year history of this litigation is a window into what continued litigation would have in store for the Class.  At the pleading stage, after Judge Greenaway denied Defendants' motions to dismiss in their entirety, Defendants moved for reconsideration of that decision in four separate motions.  The attempts at mediation were similarly contentious, spanning more than a year.  Despite the multiple indictments handed down by a grand jury of Defendant Shah and certain other former Able employees, Defendants continue to deny the substantive allegations.  The Settlement puts an end to litigation which otherwise would end only once the proceeds of the D&O insurance – already significantly diminished by the litigation occasioned by Able's collapse – have been entirely exhausted.

Accordingly, this factor strongly supports approval of the Settlement.

### 2.    The Class Supports the Settlement

After diligent measures to give detailed notice to the Class, there have been *no objections* to the Settlement, the Plan of Allocation, or Class Counsel's requested fees and expenses.  Nor has any Class member who suffered a recoverable loss requested exclusion from the Settlement.  Paucity of objections favors approval.  *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1314 n.15 (3d Cir. 1993) (silence is "tacit consent" to class action settlement); *Stoetzner v. U.S. Steel*

18

*Corp.*, 897 F.2d 115, 119 (3d Cir. 1990) (objections by only 29 of 281 class members "strongly favors settlement"); *Weber*, 262 F.R.D. at 445 ("The complete absence of objections . . . from any potential class member weighs strongly in favor of approving the settlement.").

Accordingly, this factor strongly supports approval of the Settlement.

### 3.   Settlement at This Stage of the Proceedings Is Appropriate

The stage of the proceedings and the amount of discovery completed is another factor that courts consider in determining the fairness of a class action settlement. *GM Trucks*, 55 F.3d at 785.  This factor "captures the degree of case development that class counsel have accomplished prior to settlement. . . . Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  *Id.* at 813.

The Settlement was reached after extensive motion practice at the pleading stage, and more than a year's worth of mediation, all of which entailed consultations with experts and a significant amount of factual and legal research. Lead Plaintiffs agreed to a stay of formal discovery in order to pursue mediation, and did so to preserve the proceeds of the D&O liability insurance – essentially the only remaining asset of the Company.  Class Counsel believe that engaging in full-blown, formal discovery would not have led to any material accretion of helpful evidence for the purposes of this Settlement, given the information that Class

Counsel already possess as a result of their own investigation.  This includes an

extensive pre-filing investigation centering on interviews of former Able

employees, referenced as confidential sources in Lead Plaintiffs' Complaint, and

review of the detailed indictment and plea allocution of Defendant Shah.

A showing that adequate informal discovery has been conducted in order for

counsel to gain an appreciation of the merits of the case, as well as the legal

theories and risks, supports approval.  *See In re Pet Food Prod. Liab. Litig.*, No.

07-2867 (NLH), 2008 WL 4937632, at *14 (D.N.J. Nov. 18, 2008); *see also In re

Cendant Corp. Litig.,* 264 F.3d 201, 236 (3d Cir. 2001) (approving settlement even

though litigation was at an early stage because counsel had an excellent idea of the

merits of its case at the time of settlement).

Accordingly, this factor strongly supports approval of the Settlement.

### 4.    Plaintiffs Would Face Considerable Risks in Establishing Liability at Trial

In assessing the fairness of a settlement, the Court must balance the risks of

establishing liability against the benefits secured for the Class, and the immediacy

and certainty of a substantial recovery against the risks of continuing litigation.

*Girsh*, 521 F.2d at 157.  "[T[he risks surrounding a trial on the merits are always

considerable," *Weiss*, 899 F. Supp. at 1301, and "no matter how confident one may

be of the outcome of litigation, such confidence is often misplaced."  *West Virginia

v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d

1079 (2d Cir. 1971).  Indeed, a jury verdict for plaintiffs was recently overturned by the court purely on loss causation grounds in *In re Apollo Group, Inc. Securities Litigation*, No. 04-2147 PHX-JAT, 2008 WL 3072731, at *6 (D. Ariz. Aug. 4, 2008).

The risks that Lead Plaintiffs face in establishing liability confirm that the Settlement recovery is fair, reasonable and adequate under the circumstances. Although Lead Plaintiffs believe their liability case is strong, proving fraud can be a high hurdle, and substantial defenses exist.

Lead Plaintiffs' Section 10(b) and Rule 10b-5 claims require proof of scienter, an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  To prove scienter through recklessness, Lead Plaintiffs would have to establish "highly unreasonable" conduct "involving not merely simply, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that it is either known to the defendant or is so obvious that the actor must have been aware of it."  *SEC v. Infinity Group*, 212 F.3d 180, 192 (3d Cir. 2000).  Indeed, scienter based on recklessness requires "a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception."  *In re Digital Island Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004).

21

Defendants would likely contend on summary judgment and at trial that they neither knew about, nor were severely reckless in not knowing about, the quality control or manufacturing problems at Able, and that any concealment of information was intended to mislead the FDA, not Able investors.  With respect to Defendant Wadekar, the Court or a jury potentially could find that he had no motive to defraud because his sales of Able stock during the Class Period were made over a long period of time and followed a regular pattern pursuant to a Rule 10b5-1 Trading Plan.  A trading plan can be as an affirmative defense at trial, *see* 17 C.F.R. § 240.10b5-1, and some courts have held that the existence of such a Plan negates a finding of scienter.  Further, Wadekar would likely contend that the Company took affirmative steps on his watch to address quality control problems when they came to its attention, including voluntary drug recalls.

Defendants Mauro and Boehm both would likely contend that Able had received the FDA's April 2004 Warning Letter prior to the time they joined the Company and, following that letter, the FDA approved 23 additional abbreviated new drug applications from Able, supporting an inference that Mauro and Boehm had reasonable grounds to believe that any compliance issues with the FDA were resolved or in the process of being resolved.  They would contend further that after they joined Able in April 2004 – and going forward – they took affirmative steps to address quality control problems as they arose, including a voluntary recall of four

drugs which was disclosed in Able's May 10, 2005 Form 10-Q.  Indeed, press

reports have portrayed Mauro as an innocent whistle-blower.[8]

Even Defendant Shah, who pleaded guilty to conspiracy to commit securities

fraud, could potentially escape civil liability.  In *Osio v. DeMane*, No. 05-2283

(JLL), 2006 WL 2129460 (D.N.J. July 24, 2006), Judge Linares dismissed the

plaintiffs' federal securities law claims even though the defendant had previously

pled guilty to a one-count Information charging him with making a materially false

statement related to the transaction at issue.  *Id.* at *2 n.3, *6-10.  Additionally,

Shah is not alleged to have made any misstatements—the Section 10(b) claims

against him are based solely on allegedly fraudulent *conduct* behind the scenes.  In

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159

(2008), the Supreme Court held that although a defendant's conduct was deceptive

and enabled the company to conceal the misrepresentations it made to the public,

the required element of reliance was absent when the defendant made no false

statements.

Lead Plaintiffs also face challenges to establishing that Defendants' liability

as "controlling persons" under Section 20(a) of the 1934 Act for Able's primary

violations of Section 10(b) and Rule 10b-5.  In addition to proving Able's

underlying primary violations, Plaintiffs would have to establish "culpable

---

[8] George E. Jordan, *The drug company and the bogus data; Able Labs put out bad pills in front of FDA for years,* THE STAR-LEDGER, Aug. 7, 2005, at 1.

participation" for each Defendant.  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 n.16 (3d Cir. 2006) (plaintiff must prove (though not necessary plead) culpable participation under Section 20(a)).  Failure to show scienter would likely lead to a finding of no culpable participation as well.  Moreover, with respect to Klemick, Able's Director of Regulatory Affairs, the Court or a jury potentially could conclude that she was not a "controlling person" because she was neither an officer nor a director for most of the Class Period.

Another risk of continued litigation facing the Class relates to Lead Plaintiffs' reliance upon expert witnesses.  Expert testimony concerning FDA regulatory standards and drug manufacturing processes would likely be a necessary part of Lead Plaintiffs' case-in-chief.  The acceptance of expert testimony by a jury is always far from certain, and the Settlement avoids the risks and costs of competing experts that could result in a finding against the Class at trial.

Thus, this factor strongly favors approval of the Settlement.

### 5.   Plaintiffs Face Risks in Establishing Damages

Loss causation and damages in securities litigation are often difficult to establish, and proof is typically reduced to a battle of the experts.  This could lead a jury in this matter to minimize the Class's proffered losses caused by Defendants' participation in the alleged fraud.  *See In re Genta Sec. Litig.*, No. 04-2123 (JAG), 2008 WL 2229843, at *7 (D.N.J. May 28, 2008) (finding that

"competing expert testimony likely would have created sufficient uncertainty regarding the exact amount of damages that could be recovered"); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) (noting unpredictability of outcome of a battle of damage experts), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

Here, at summary judgment or trial, the finder of fact potentially could credit Defendants' experts over those of the Class and determine that the Class suffered no (or only modest) recoverable damages. *See, e.g., In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (granting motion for summary judgment for failure to demonstrate loss causation); *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on loss causation grounds).

The uncertainty of a jury's acceptance of what Lead Plaintiffs may propound through expert testimony favors approval of the Settlement.

### 6.     The Risks of Maintaining
### the Class Action Through Trial

While Lead Plaintiffs believe that this case is appropriate for class certification, certification can always be reviewed or modified before trial and a class may be decertified at any time.  "An order that grants or denies class certification may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1)(C); *see Barnes v. American Tobacco Co.*, 161 F.3d 127, 140 (3d Cir.

1998); *Bayshore Ford Truck v. Ford Motor Co.*, No. 99-741 (JLL), 2010 WL

415329, at *2 (D.N.J. Jan. 29, 2010) (decertifying class where the subsequent

development of the facts showed the original determination was unsound).

The risks of failing to obtain or maintain class certification through trial

militate in favor of approval of the Settlement, and, at a minimum, do not cast

doubt upon its fairness.

### 7.    Defendants' Ability to Withstand a Greater Judgment

Defendants would not be able to withstand a greater judgment at trial than

this Settlement.  Defendants' resources are limited to their D&O liability

insurance, which was capped at the outset at $25 million, and, as a result of the

civil and criminal actions against Defendants, has been significantly drawn down.

In addition, while it is ordinarily the case that the assets of individual officers are

insufficient to satisfy classwide damages, the existence of civil and criminal

litigation against them, with corresponding associated costs and risks to their

assets, removes any doubt that Class members here can rely solely on the declining

proceeds of the insurance policies.  Lead Plaintiffs submit that this underscores the

urgency of—and strongly favors—approval of the proposed Settlement.

### 8. The Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation

Finally, the Court must "measure[] the value of the settlement itself to determine whether the decision to settle represents a good value for a relatively weak case or a sell-out of an otherwise strong case." *GM Trucks*, 55 F.3d at 806. The Third Circuit further stated:

> [I]n cases primarily seeking monetary relief, the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement . . . The evaluating court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.

*Id.* (citations omitted).

It is well-settled that "the fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *E.g., Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997), *aff'd,* 166 F.3d 581 (3d Cir. 1999). Given Defendants' lack of available resources, and against the backdrop of the *Girsh* factors described above, there can be little doubt that the Settlement, as described herein, represents the best possible outcome for the Class members in this matter. As a practical matter, Lead Plaintiffs recovered all of the

27

money that was reasonably available to recover.  Accordingly, Lead Plaintiffs

submit that the *Girsh* factors, taken together, strongly favor final approval of the

proposed Settlement.

## II.  <u>THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS</u>

In the Preliminary Approval Order, Judge Greenaway conditionally

determined that all of the requirements for class certification under Rules 23(a) and

(b)(3) were met.  Nothing has occurred subsequently to cast doubt on these

determinations, and there have been no objections to class certification.

Accordingly, the Court should make class certification final for purposes of

proceeding with the Settlement.

## III.  <u>THE COURT SHOULD APPROVE THE PLAN</u><br><u>OF ALLOCATION OF THE NET SETTLEMENT FUND</u>

"[A]pproval of a plan of allocation of a settlement fund in a class action is

governed by the same standards of review applicable to approval of the settlement

as a whole: the distribution plan must be fair, reasonable and adequate."  *In re*

*Merck & Co., Inc. Vytorin ERISA Litig.*, No. 08-CV-285 (DMC), 2010 WL

547613, *6 (D.N.J. Feb. 9, 2010) (citing *In re Ikon Office Solutions, Inc., Sec.*

*Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000)).  The Court's principal obligation is

"simply to ensure that the fund distribution is fair and reasonable as to all

participants in the fund."  *Walsh v. Great Atl. & Pac. Tea Co.,* 726 F.2d 956, 964

(3d Cir. 1983).  Further, when "formulated by competent and experienced class

28

counsel," a plan for allocation of net settlement proceeds "need have only a reasonable, rational basis." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004). "Generally, a plan that reimburses class members based on the nature and extent of their injuries is considered reasonable." *Mehling v. New York Life Ins. Co.*, 248 F.R.D. 455, 463 (E.D. Pa. 2008).

As was contemplated when the Settlement was reached with the assistance of Judge Greenaway and Magistrate Judge Arleo, the claims of the members of the Class and the Consumer Class will be paid from a single fund, so as to minimize claims administration expenses. Accordingly, Class Counsel, conferred with counsel for the Consumer Class to prepare the Plan. McIntyre Decl. ¶ 23.

Pursuant to the Plan of Allocation, the Net Settlement Fund will be distributed on a *pro rata* basis to each Class and Consumer Class member who submits a valid proof of claim. Each claimant's share will be a percentage of the Net Settlement Fund equal to the amount of its Recognized Loss compared to the total Recognized Losses of all claimants.[9] McIntyre Decl. ¶ 23. Calculation of a

---

[9] The Plan also contains a *de minimis* provision whereby no payments will be made to claimants who would be entitled to receive less than $10.00. This is intended to protect the Net Settlement Fund from depletion by administrative costs associated with claims that are unlikely to exceed those costs, and to limit the number of small checks that may go uncashed. The use of such a *de minimis* threshold is standard and benefits the Class as a whole. *See In re Gilat Satellite Networks, Ltd.,* No. CV 02-1510, 2007 WL 1191048, at *9 (E.D.N.Y. Apr. 19, 2007) ("[D]e minimus thresholds for payable claims are beneficial to the class as a whole . . . and courts have frequently approved such thresholds, often at $10.");

claimant's Recognized Loss takes into consideration the general strengths and weaknesses of the claims of Class and Consumer class members.  Thus, Class members who purchased Able stock during the Class Period and sold it prior to the corrective disclosures will have a Recognized Loss equal to one-tenth of their out-of-pocket losses, while those who continued to hold their shares at the time of the corrective disclosure – and thus have stronger claims – will have a Recognized Loss equal to the decline in Able's stock price following that disclosure (or the full amount of their out-of-pocket loss, if that amount is lower).  McIntyre Decl. ¶ 24. *See In re Aetna Sec. Litig.,* No. Civ. A. MDL 1219, 2001 WL 20928, at *12 (E.D. Pa. Jan. 4, 2001) (approving plan of allocation that "acknowledges the differing losses suffered by Claimants depending on the dates on which they purchased and sold Aetna stock and the price at which they may have sold the shares").  For the Consumer Class, the Recognized Loss formula is based on the price paid for Able's generic drug products, and the Plan distinguishes between Third-Party Payors *(i.e.,* health insurers) and retail purchasers to account for the relative weakness in Third-Party Payor versus direct claims.

---

*Global Crossing,* 225 F.R.D. at 463 (stating that "counsel are entitled to use their discretion to conclude that … the need to avoid excessive expense to the class as a whole outweighs the minimal loss to the claimants who are not receiving their de minimis amounts of relief" and concluding that "Securities Lead Counsel acted reasonably in including a $10 de minimis threshold in the allocation plan").

The Plan of Allocation is set forth in full in the Notice sent to Class members, and no one has objected to the Plan. *See* McIntyre Decl. ¶ 25. Accordingly, Lead Plaintiffs submit that the Plan of Allocation is fair and reasonable and should be approved.

## IV.   THE COURT SHOULD GRANT CLASS COUNSEL'S APPLICATION FOR ATTORNEY'S FEES AND EXPENSES

Class Counsel litigated this Action on behalf of the Class on a contingent fee basis, and advanced all expenses on behalf of the Class.  In accordance with a fee agreement negotiated at the outset of the case by Lead Plaintiffs (both of which are sophisticated institutional investors), Class Counsel is applying for – and Lead Plaintiffs support – an award of attorney's fees equal to 12% of the Settlement amount.  This amounts to $1,098,000 from the initial $9,150,000 Settlement Payment, and will also include 12% of any additional proceeds the Class receives from the Reserve.[10]  Additionally, Lead Plaintiffs support Class Counsel's request for reimbursement of their $180,436.12 in litigation expenses from the Settlement proceeds, plus interest accruing from the date the Settlement Payment was made.

---

[10] As noted above, Counsel for the Consumer Class negotiated for their attorney's fees and expenses to be paid independently of the Settlement proceeds benefiting the Securities and Consumer Classes.

Notice of this application for fees and expenses has been provided to the Class as part of the Class Notice, and not a single objection has been lodged.[11]

It has long been recognized that an attorney who recovers a common fund for the benefit of a class is entitled to recover reasonable attorney's fees payable from the fund. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79 (1980). In the Third Circuit, "[a]ttorneys' fees are typically assessed through the percentage-of-recovery method or through the lodestar method." *In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009); *AT&T*, 455 F.3d at 164. The former "applies a certain percentage to the [settlement] fund." *Id.* The latter "multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." *Id.* "After a court determines the lodestar amount, it may increase or decrease that amount by applying a lodestar multiplier." *Diet Drugs*, 582 F.3d at 540 n.33. "The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) (quoting *Prudential*, 148 F.3d at 333). The Third Circuit has recommended, however, that courts perform a lodestar cross-check to ensure that the percentage-of-recovery award is neither too high nor too

---

[11] The Notice stated that Class Counsel would apply reimbursement of expenses "in the approximate amount of $250,000, plus interest on such … expenses at the same rate as earned by the Settlement fund." *See* Cirami Aff. Ex. A, at 5.

low.  *See AT&T Corp.*, 455 F.3d at 164; *Rite Aid*, 396 F.3d at 306-07.  Class

Counsel's requested fee award is reasonable under both the percentage-of-recovery

and the lodestar approaches.

When applying the percentage-of-recovery method, the courts in this Circuit

typically consider a non-exhaustive list of factors, known generally as the *Gunter*

factors, to determine a reasonable percentage.[12]  These include: (1) the size of the

fund and the number of beneficiaries, (2) the presence or absence of substantial

objections by members of the Class to the settlement terms and/or the fee request,

(3) the skill and efficiency of the attorneys, (4) the complexity and duration of the

litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case,

(7) awards in similar cases, (8) the benefits attributable to the efforts of Class

Counsel relative to the efforts of other groups, such as government agencies

conducting investigations, (9) the percentage fee that would have been negotiated

had the case been subject to a private contingent fee arrangement at the time

counsel was retained, and (10) any innovative settlement terms.  *See Gunter*, 223

F.3d 190, 195 n.1; *Prudential*, 148 F.3d at 336-40; *Diet Drugs*, 582 F.3d at 541 &

n.34.

---

[12] These factors were first articulated in *Gunter v. Ridgewood Energy Corp.*,
223 F.3d 190, 195 n.1 (3d Cir. 2000), and have been expanded in subsequent case
law to include additional considerations.

The role of the *Gunter* factors here is different from the usual case, however, because Class Counsel's fee request is made pursuant to a fee agreement that was agreed upon at the outset of the case between Class Counsel and the two sophisticated institutional investors that were appointed by the Court as Lead Plaintiffs under the PSLRA.[13]  The Third Circuit has held that "under the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel."  *Cendant*, 264 F.3d at 282.  As the Court explained:

> This presumption will ensure that the lead plaintiff, not the court, functions as the class's primary agent vis-a-vis its lawyers.  Further, by rendering ex ante fee agreements more reliable, it will assist those agreements in aligning the interests of the class and its lawyers during the pendency of the litigation.

_____

[13] The fee agreement was initially entered between DERP and Grant & Eisenhofer P.A.  As stated in a declaration submitted by DERP's general counsel in connection with the lead plaintiff motions in August 2005, this agreement "was the result of hard bargaining and arm's length negotiations" and "provides (subject to court approval) for attorneys' fees between 9% and 23% of the class recovery, depending upon the amount and stage of the recovery").  Declaration of Victoria Halliday, General Counsel for the Denver Employees Retirement Plan, ¶ 5 (Dkt. No. 30).  Subsequently, when DERP and Deka began to discuss the possibility of serving together as Co-Lead Plaintiffs, DERP required as part of such an agreement that Deka and its counsel agree to the terms of that fee agreement.  *Id.* When Deka later substituted the law firm of Labaton Sucharow LLP for its prior counsel, DERP required that the Labaton firm agree to accept the existing fee agreement, and Labaton, in consultation with Deka, did so.  McIntyre Decl. ¶ 14. Class Counsel will submit the fee agreement to the Court *in camera* upon request.

*Id.* When an *ex ante* fee agreement is present, as here, the *Gunter* factors are applied for the purpose of determining whether the presumption of reasonableness has been rebutted, rather than for the purpose of assessing reasonableness in the first instance. *Id.* at 284; *In re Lucent Tech., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 432 (D.N.J. 2004).

Review of the *Gunter* factors here reveals no reason to depart from the fee agreement. The Class consists of thousands of members, none of whom have objected to the Settlement or Class Counsel's fee request. The absence of objections is not surprising, because 12% is well below the fee percentages that are typically awarded in securities class actions. *See, e.g.*, *In re Bristol-Myers Squibb Sec. Litig.*, No. 06-2964, 2007 WL 2153284, at *1 (3d Cir. July 27, 2007) (affirming fee award of 19.77%, noting that district court had found the percentage to be on the "low end" as compared to similar cases); *Louisiana Mun. Police Empl. Ret. Sys. v. Sealed Air Corp.*, No. 03-CV-4372 (DMC), 2009 WL 4730185, at *8 (D.N.J. Dec. 4, 2009) (awarding 30% fee and finding that "[t]his award is similar to settlements in other cases in this circuit"); *In re Sterling Fin. Corp. Sec. Class Action*, No. 07-2171, 2009 WL 2914363, at *4 (E.D. Pa. Sept. 10, 2009) (awarding 30%); *Lucent*, 327 F. Supp. 2d at 432 ("As a general matter, awards … can widely range from nineteen percent to forty-five percent of a settlement fund.").

35

This case was every bit as complex as other securities class actions, as it involved difficult factual and legal questions under the federal securities laws, as well as technical issues surrounding Lead Plaintiffs' allegations that the Defendants lacked sufficient controls over its drug manufacturing process and violated numerous FDA regulations.  Class Counsel are experienced federal securities litigators who spent more than 4,400 hours on this litigation and advanced over $180,000 in expenses on behalf of the Class, with no guarantee of payment.  After successfully defeating motions to dismiss filed by three sets of defendants represented by three nationally prominent law firms, and in recognition of the limited and diminishing assets that were available to satisfy a judgment, Lead Plaintiffs and Class Counsel negotiated a Settlement providing for a sizeable cash recovery to the Class – likely more than could have been collected following a favorable verdict at trial.  This recovery was entirely attributable to Class Counsel's efforts, and not the work of any government agencies.

Moreover, the settlement negotiations were exceedingly arduous and complex, lasting more than a year and requiring not only the resolution of disputes between the parties in this action, but also disputes regarding the proper allocation of Settlement proceeds among the plaintiffs in three different lawsuits, as well as coverage disputes between the Defendants and their insurance carriers.  Based on all of these factors, the negotiated fee of 12% is eminently reasonable and well-

justified under the percentage-of-recovery method.

      Application of a lodestar cross-check further confirms the reasonableness of Class Counsel's fee request.  Under this method, the court "multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services."  *AT&T Corp.*, 455 F.3d at 164.  Through May 28, 2010, Class Counsel have expended a total of 4,446.85 hours on this litigation, and when multiplied by Class Counsel's standard hourly rates, this time equates to a lodestar value of $2,385,133.50.  *See* McIntyre Decl. ¶¶ 17, 18 and Exs. 2, 4, 5 & 6.[14]  Although Class Counsel submit that the results achieved and the risks undertaken would justify a lodestar "multiplier," the fee sought represents a substantial discount to lodestar.  Based on the initial $9,150,000 Settlement Payment, a 12% fee equals $1,098,000, which is ***less than half of the lodestar amount***.  If the Class were to receive the maximum amount possible from the Reserve ($1,125,000), that would increase the fee by $135,000, for a total fee of $1,233,000 – still only 51.7% of

---

    [14] This time was spent on, among other tasks, conducting a factual investigation and performing legal research for the Complaint; drafting the Complaint; responding to Defendants' motions to dismiss and Defendants' motions to reconsider the denial of their motions to dismiss; preparing Lead Plaintiff's motion for partial summary judgment against Defendant Shah; attending numerous mediation sessions and settlement conferences; and negotiating and drafting the Settlement Agreement and other settlement documents.  *See* McIntyre Decl. ¶ 17. The Third Circuit has recognized that district courts need not review counsel's detailed billing records, but may rely on summaries provided by counsel when conducting a lodestar cross-check.  *See, e.g.*, *Rite Aid*, 396 F.3d at 306-07; *Prudential*, 148 F.3d at 342.

Class Counsel's lodestar.  Thus, while counsel in successful securities class actions often receive multiples of their lodestars,[15] the fee agreement here has limited Class Counsel's request to only a fraction of its lodestar.  Clearly, the fee request is fair and reasonable to the Class and should be approved.  *Accord Insurance Brokerage*, 579 F.3d at 284-85 (lodestar cross-check confirmed reasonableness of class counsel's fee request, where requested fee was "only a fraction of the work that they billed"); *Louisiana*, 2009 WL 4730185, at *7 (lodestar cross-check supported reasonableness of fee when lodestar "multiplier" was less than one).

 Class Counsel have also advanced $180,436.12 to date in litigation expenses and costs on behalf of the Class, for such items as duplication costs, filing fees, postage, travel expenses, expert fees, mediation fees, and on-line legal research charges.  *See* McIntyre Decl. ¶ 18, 19 & Exs. 2-6 (providing itemizations of each firm's expenses, by category).[16]  Lead Plaintiffs and Class Counsel respectfully

---

[15] *See, e.g.*, *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir. 2001) (approving lodestar multiplier of 2.99 in a case that "was neither legally nor factually complex," lasted only a few months, and involved virtually no discovery); *Sterling Fin.*, 2009 WL 2914363, at *4 (citing cases within Third Circuit where multipliers between 2.17 and 15.6 were awarded); *Louisiana*, 2009 WL 4730185, at *9 ("In many cases, percentage-of-fund awards are significantly greater than the lodestar value (i.e., result in positive multipliers), and courts nonetheless find the fee awards to be reasonable.") (citations omitted); *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 104 (D.N.J. 2001) (listing fee awards involving multiples between 2.04 and 3.6).

[16] Courts may rely on summaries of expenses when evaluating the a request for reimbursement, and need not review the receipts or other underlying

submit that these expenses were reasonable and necessary, and should be reimbursed from the Settlement Fund.  *See Louisiana*, 2009 WL 4730185, at *10 (class counsel are entitled to reimbursement of expenses that were "adequately documented and reasonably and appropriately incurred in the prosecution of the case") (citations omitted); *Safety Components*, 166 F. Supp. 2d at 108 (same; awarding reimbursement of photocopying expenses, phone and facsimile charges, postage, messenger and express mail charges, filing and witness fees, computer-assisted legal research expenses, expert fees, and travel expenses); *Janney Montgomery Scott*, 2009 WL 2137224, at *17 (granting request for reimbursement of expenses, and noting that "[i]tems such as photocopying, telephone and fax charges, express mail charges, expert witness fees, and computer-assisted research are necessary for the prosecution of a large class action lawsuit.").

## <u>CONCLUSION</u>

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court (a) grant final approval to the proposed Settlement as fair, reasonable and adequate; (b) finally certify the Class for settlement purposes; (c) approve the Plan of Allocation of the Net Settlement Fund; and (d) approve Class Counsel's application for attorneys' fees and expenses.

---

documentation of those expenses.  *See In re Janney Montgomery Scott LLC Fin. Consultant Litig.*, No. 06-3202, 2009 WL 2137224, at *17 (E.D. Pa. July 16, 2009); *Chemi v. Champion Mortg.*, No. 05-CV-I238 (WHW), 2009 WL 1470429, at *13 (D.N.J. May 26, 2009).

A proposed Final Order and Judgment has been agreed to by the parties and is respectfully submitted herewith.

DATED: June 2, 2010                                Respectfully submitted,

                                    By:    /s/ Megan D. McIntyre
                                           Stuart M. Grant
                                           Megan D. McIntyre
                                           James R. Banko
                                           GRANT & EISENHOFER P.A.
                                           1201 North Market Street
                                           Wilmington, Delaware  19801
                                           Telephone: (302) 622-7000
                                           Facsimile: (302) 622-7100
                                           *Co-Lead Counsel for*
                                           *Lead Plaintiffs and the Class*

                                           Thomas A. Dubbs
                                           Ira A. Schochet
                                           David J. Goldsmith
                                           LABATON SUCHAROW LLP
                                           140 Broadway
                                           New York, New York  10005
                                           Telephone: (212) 907-0700
                                           Facsimile: (212) 818-0477
                                           *Co-Lead Counsel for*
                                           *Lead Plaintiffs and the Class*

Kevin P. Roddy
WILENTZ, GOLDMAN
   & SPITZER, P.A.
90 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, New Jersey  07095
Telephone: (732) 636-8000
Facsimile: (732) 726-6686
*Local Counsel for*
*Lead Plaintiffs and the Class*